## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| EQUAL EMPLOYMENT | § | |
| OPPORTUNITY  COMMISSION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-05-2232 |
| | § | |
| J. H. WALKER, INC., | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND OPINION

The Equal Employment Opportunity Commission filed this discrimination complaint against J. H. Walker, Inc. d/b/a Superior Delivery Service (SDS), and J. H. Walker Trucking, alleging that a former employee of SDS, Christy Ziegler (formerly Christy Hall), had been discriminated against on the basis of her sex.  The EEOC alleged that Ziegler received less pay than a man who was hired on the same day for the same sales job she was hired to do; that she was sexually harassed by her immediate supervisor and by the company founder and president; and that she was retaliated against for complaining about her treatment.  The EEOC asserted violations of the Equal Pay Act of 1963 (EPA), 29 U.S.C. § 206(d), and Title VII of the Civil Rights Act (Title VII), 42 U.S.C. §§ 2000e-5(f)(1) and (3).

J. H. Walker moved for summary judgment.  (Docket Entry No. 19).  The EEOC responded, (Docket Entry No. 28), and J. H. Walker replied, (Docket Entry No. 33).  Both sides have supplemented these filings.  (Docket Entry Nos. 29, 30, 31, 35, 37).  The EEOC

has filed a motion to strike corrections to a deposition transcript, (Docket Entry No. 36), to which J. H. Walker has responded, (Docket Entry No. 38).

Based on a careful review of the pleadings, the motion and response, the parties' submissions, and the applicable law, this court denies the motion to strike and grants in part and denies in part the motion for summary judgment. Specifically, the motion for summary judgment is granted as to the discriminatory pay claim and the retaliation claim, and denied as to the sexual harassment claim. The reasons for these rulings are set out below.

## II.     Factual Background

J. H. Walker, Inc. is a Texas corporation that operates as Superior Delivery Services (SDS) and J. H. Walker Trucking. SDS provided local courier and delivery services in the Houston area; J. H. Walker Trucking provided long-distance trucking services. (Docket Entry No. 29, Ex. 37 at 10–11). During the relevant period, SDS had approximately six to eight employees; J.H. Walker had approximately one hundred. John H. Walker, III is the founder and president of J. H. Walker, Inc. and of both SDS and J. H. Walker Trucking; Kevin Mullen, the director of personnel and safety, handled the human resources work for both SDS and J. H. Walker Trucking. (Docket Entry No. 29, Ex. 37 at 9–10; Docket Entry No. 31, Ex. B at 9).[1]

---

[1] The EEOC argued that J. H. Walker, SDS, and J. H. Walker Trucking are an integrated employer. (Docket Entry No. 28 at 4–5). J. H. Walker, Inc. has not responded. There does not appear to be an issue as to whether J. H. Walker can be sued as an employer under Title VII.

2

## A.    The Evidence as to the Discriminatory Pay Allegation

Beginning in October 2002, J. H. Walker advertised to fill a sales position.  Although J. H. Walker had initially looked for only one salesperson, both Ziegler and Tracey Hoover, a male, were hired on the same day to work in sales for SDS.  (Docket Entry No. 33, Ex. A at 33).  Mullen, the human resources director, and Mark Grahmann, the operations manager for SDS, did preliminary interviews and decided who Walker should interview.  Walker made the hiring decisions.  (Docket Entry No. 33, Ex. A at 14; Ex. B at 24–25).

Both Ziegler and Hoover were hired on February 10, 2003.  (Docket Entry No. 29, Exs. 10, 11, 19, 21, 22, 24).  From February 2003 to October 2003, Ziegler was paid $32,000 annually; Hoover was paid $36,000 annually.  (Docket Entry No. 29, Ex. 11, 20).  Ziegler received a $4,000 increase in October 2003.

The EEOC contends that Ziegler and Hoover were hired for the same job; that they performed similar job duties; that Ziegler had more sales experience than Hoover; and that although Hoover had a college degree and Ziegler did not, the evidence shows that Walker did not consider a degree relevant to the position.  The EEOC contends that Ziegler received the same pay as Hoover because she complained of the disparity.  J. H. Walker responds that Ziegler and Hoover were hired for different jobs, reflected in the written job descriptions stating that Ziegler had a "Sales I" job and Hoover a "Sales II" job that included additional supervisory duties; that Hoover had more sales experience than Ziegler; and that Hoover had

a college degree, while Ziegler did not.  J. H. Walker asserts that it increased Ziegler's pay in October 2003 based on her performance.  J. H. Walker asserts that the initial difference in compensation was based on factors other than sex.

Ziegler graduated from high school in 1996 and went to college for one year.  (Docket Entry No. 29, Ex. 37 at 40).  Before February 2003, Ziegler had worked in different jobs, including customer service, real estate, and retail.  (*Id.* at 62–64).  In 2002, Ziegler worked for a airline cargo company called Cargolux for eight or nine months, some part-time and some full-time.  For approximately five months of that job, Ziegler's duties involved a combination of office and sales work.  Ziegler also did sales work for two months for the real estate company and for two months for a company called AIT.  In her deposition, Ziegler acknowledged that before coming to SDS, she had "12 or less months" of sales experience.  (*Id.* at 46, 274).

Hoover is a May 2002 college graduate with a degree in business administration from the University of Houston, where he majored in finance.  (Docket Entry No. 29, Ex. 13).  While a student, Hoover worked 30 hours per week from September 2000 to May 2003 selling advertising for the major university newspaper.  (*Id.*).  In that position, he was paid entirely on a commission basis.  He won a national sales award for that work.  Hoover also worked at a brokerage house doing sales work for three months.  In her deposition, Ziegler acknowledged that Hoover had 23 months of sales experience, more than she did.  (Docket Entry No. 29, Ex. 37 at 274).

In her interview with Mullen and Grahmann, Ziegler said that a $36,000 salary would be "good money." In his interview, Hoover said that he wanted $38,000. (Docket Entry No. 33, Ex. A at 38, 57). When they were hired, Ziegler's starting salary was $32,000, and Hoover's starting salary was $36,000. (Docket Entry No. 29, Ex. 26; Ex. 29; Ex. 35 at 7). Walker set their salaries. (Docket Entry No. 33, Ex. A at 17, Ex. B at 24–25). In his deposition, Walker testified that he made the compensation decision based on the differences in education and experience. (*Id*. at 92–95). Walker also testified that Hoover did some supervisory work that Ziegler did not. The EEOC asserts that in the initial EEOC investigation, Walker told an agent that Hoover's and Ziegler's jobs were identical and that a college degree was not needed to perform their sales job. (Docket Entry No. 29, Exs. 30, 33, 38). Walker denies making this statement. (Docket Entry No. 29, Ex. 37 at 207).

Mullen testified in his deposition that he did not know until after Walker had hired both Hoover and Ziegler that Hoover would be paid more than Ziegler. (Docket Entry No. 33, Ex. A at 17, 53). Shortly after they were hired, Mullen created employee files for Ziegler and Hoover. (Docket Entry No. 33, Ex. A at 47–48). The personnel forms show that Ziegler worked in "SDS-Sales" and Hoover in "Superior Sales." (Docket Entry No. 29, Exs. 11, 20). The payroll records show that both Hoover and Ziegler are in "Sales." (Docket Entry No. 29, Exs. 27, 29). Mullen wrote on their Employee History forms that Ziegler's job was "SUPERIOR (SALES I)" and Hoover's was "SUPERIOR SALESMAN (II)." (Docket Entry No. 29, Exs. 22, 24; Docket Entry No. 33, Ex. A at 53). Mullen testified that he wrote job descriptions for Ziegler's and Hoover's jobs. (Docket Entry No. 33, Ex. A at 50–51).

5

Mullen wrote these descriptions as part of his job as personnel director; Walker was not involved.  (*Id.* at 53).  Mullen created the Sales I and Sales II job descriptions to reflect the new hires "with the disparity of experience and education in mind."  (*Id.* at 51).  The EEOC contends that the documents showing two sales positions—Sales I and Sales II—were created after the EEOC complaint was filed.  The EEOC accuses J. H. Walker of fabricating the job description to make it appear that there were differences between the positions Hoover and Ziegler filled.  The EEOC points to the fact that a third SDS salesperson, William Hunt, had been hired previously and was not categorized as Sales I or II.  (*Id.* at 54–55).  However, a Sales II salesperson was later hired for J. H. Walker Trucking.  (*Id.* at 55–56, Ex. 37 at 227).

The Sales I and Sales II job descriptions include differences in qualifications, duties, and pay.  (Docket Entry No. 29, Exs. 23, 25).  The Sales I description states: "No relevant experience/No degree"; the Sales II description states "Experienced/Relevant degree."  (*Id.*).  Both are classified as exempt for FLSA purposes, have the same supervisors, and the same hours,  "Mon.–Fri. 8:00–5:00; additional time as required."  (*Id.*).  Both the Sales I and Sales II job descriptions set out the following duties:

> At the direction of the Manager, Superior Delivery Service incumbent will call on local businesses in assigned territory. Incumbent will also service existing accounts with billing paperwork, claim and service issues.  Incumbent will maintain daily contact with Supervisor via Company-issued Nextel phone and Company-reimbursed cellular telephone.  Incumbent will provide Supervisor with daily itinerary and weekly Sales Activity Report.  Incumbent may be called upon to assist with deliveries during peak/unusual periods.  Incumbent will also

6

learn the dispatching software and may be called upon to assist in Dispatch from time to time. Incumbent may be required to start and/or end the day in the office at the discretion of the Supervisor. Additional duties may be assigned by the Supervisor or any other Manager.

(*Id.*). The Sales I job description has the following duties:

> 1. Call upon local businesses in assigned territory.
> 2. Maintain contact with Supervisor at all times.
> 3. Provide Supervisor with a daily itinerary.
> 4. Complete required reports including but not limited to a Weekly Sales Activity Report.
> 5. Service existing accounts with service issues, billing/ paperwork, claims, etc.
> 6. Assist with any special projects.
> 7. Assist with deliveries and dispatch during peak/unusual periods.
> 8. Any other duties assigned by the Supervisor or any other Manager.

The Sales II job description lists these same duties but adds two more:

> 8. Assist in the training and supervision of junior salespeople and staff.
> 9. Serve in place of the Manager when called upon to do so.

(*Id.*). Sales I and Sales II have different pay scales, respectively "$28,000 - $32,000" and "32,000 - $40,000." (*Id.*).

When Ziegler and Hoover started work in February 2003, Mullen guided them through the paperwork and orientation. (Docket Entry No. 29, Ex. 37 at 65–66; Docket Entry No. 33, Ex. B at 27). Grahmann trained both Ziegler and Hoover. (Docket Entry No. 31, Ex. A at 49). It is undisputed that their primary job duty was sales. Grahmann testified that in 2003, Hoover had managerial responsibilities in addition to his primary sales duties,

7

while Ziegler did not.  (*Id*. at 32–38).  When Grahmann was unavailable, he asked Hoover to fill in by dispatching deliveries and completing reports for Walker.  (*Id*. at 34–35).  When Grahmann's national guard service took him out of the office, Grahmann assigned Hoover to fill in.  (*Id*. at 36–37).  Walker gave similar testimony.  (Docket Entry No. 29, Ex. 37 at 206, 215).  When Grahmann was called to military service in Iraq in July 2004, Hoover took his position as the SDS operations manager.  (Docket Entry No. 29, Ex. 37 at 99).

In October 2003, Ziegler's salary was increased to $36,000 for her performance. (Docket Entry No. 31, Ex. A at 65).  The EEOC asserts that this raise demonstrates that she was not hired for a Sales I position, because $36,000 is above the salary range for that position.  Grahmann testified that in the past, she had asked for a salary increase because she needed to make more money, because she had brought in some good accounts, and because Hoover was making more money.  Grahmann talked to Walker and asked him to approve the salary increase for Ziegler because her performance justified it.  (*Id*. at 66).  Walker testified that he agreed to the salary increase based on Ziegler's successful performance in bringing in new customers.  (Docket Entry No. 29, Ex. 37 at 147).

### B.    The Evidence as to the Sexual Harassment Allegation

Ziegler alleged that during the eleven months she worked for J. H. Walker, she was sexually harassed in the form of statements by Walker; unwelcome touching by Walker, and statements by Grahmann.  Ziegler alleged that Walker made the following statements:

1.    Sometime before October 2003, when Walker and Ziegler were in the SDS facility mechanic shop, they walked by a boat that Walker owned.  Ziegler

testified that Walker invited her to ride in his boat by stating: "Well, do you know the only way you can ride on my boat? Topless." (Docket Entry No. 29, Ex. 36 at 150, 152). Walker denied any such statement. (Docket Entry No. 29, Ex. 37 at 132–33).

2.  Before a November 2003 company sales meeting, which was to take place at Walker's ranch, he stated in front of other employees, including Grahmann: "You have three options. You can sleep in my bed, Tracey's bed, or Mark's bed, but I prefer you sleep in mine." (Docket Entry No. 29, Ex. 36 at 171–72). Walker denied making this statement and Grahmann denied hearing it. (Docket Entry No. 29, Ex. 37 at 131–32; Docket Entry No. 33, Ex. A at 31–32).

3.  On one occasion, when Ziegler was in Walker's office, she said that her back hurt. Walker offered to give her a back rub. She declined. As she walked out of the office, Walker asked her to give him a back rub. (Docket Entry No. 29, Ex. 36 at 157). Walker denied the statement. (Docket Entry No. 29, Ex. 37 at 133).

Ziegler also alleged that after she told Walker that she was moving in with her boyfriend, Walker gave her an article "saying that women who move in before marriage lose out." (*Id.* at 202). Ziegler alleged that Walker and several coworkers commented on a tattoo that she had on her lower back. (*Id.* at 204-205).

9

Ziegler testified that Walker would come up behind her while she was working at a computer and rub her shoulders. Ziegler estimated that this happened approximately twenty times over the eleven months of her employment. (*Id*. at 154, 157). Walker denied any such touching. Ziegler acknowledged that she did not complain to Walker about any of his comments or about the shoulder rubs. (*Id*. at 308). Ziegler testified that she would "give subtle hints of leaving the room to leave the situation or to pull away from him." (*Id*. at 314–15.)

J. H. Walker disputes Ziegler's testimony about Walker's comments and actions. Grahmann testified that he did not hear Walker make the comments alleged, although Ziegler testified that Walker made one of these comments in Grahmann's presence. Grahmann testified that he did not see Walker rub Ziegler's shoulders. (Docket Entry No. 31, Ex. A at 31, 39–40). Mullen testified that he did not hear Walker make any inappropriate comments to Ziegler and did not see Walker rub Ziegler's shoulders. (Docket Entry No. 33, Ex. B at 22–23). Walker denied making these comments or giving Ziegler back rubs. (Docket Entry No. 29, Ex. 37 at 133-36).

Ziegler also alleged that Grahmann made sexually offensive statements. She testified that Grahmann repeatedly commented that Ziegler was able to make sales because of her sex and because she could wear skirts. (*Id*. at 130–33, 145–48) ("I could go in a company and I know everything about their business and everything they need to make their business, and you could walk in there and you would get it over me because you're a woman." "I could get the business if I had a dress." "You should wear a skirt if you want to get more

10

business.").  Grahmann denied making these comments.  (Docket Entry No. 33, Ex. A at 81).

J. H. Walker's written employee handbook contained the company's antiharassment policy and complaint procedure.  It stated:

**What is Harassment:**

Harassment can take many forms.  It may be, but is not limited to: words, signs, jokes, pranks, intimidation, physical contact or violence.   Harassment is not necessarily sexual in nature. Sexual harassment may include unwelcome sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature when such conduct creates an intimidating environment, prevents an individual from effectively performing the duties of their position or when such conduct is made a condition of employment or compensation, either implicitly or explicitly.  As an employee of the Company you are responsible for keeping our work environment free of harassment.

**Reporting:**

If you feel that you have experienced harassment report the incident immediately to your supervisor or any supervisor with whom you feel comfortable, the Director of Personnel or the President of The Company.  Any employee who becomes aware of an incident of harassment, whether by witnessing the incident or being told of it has a duty to report it as well.  Appropriate investigation and disciplinary action will be taken.  All reports will be promptly investigated with die regard for the privacy of everyone involved.

An employee found to have harassed a fellow employee or subordinate will be subject to severe disciplinary action or possible discharge.  The Company will also take any additional action necessary to appropriately correct the situation.

The Company accepts no liability for harassment of one employee by another employee.  The individual who harasses another employee is personally liable for such actions and consequences.

(Docket Entry No. 29, Ex. 28 at 22).  Ziegler acknowledged receiving a copy of this policy at orientation.  (Docket Entry No. 29, Ex. 36 at 67).

Ziegler testified that she told Grahmann several times that she did not appreciate comments that he made.  "I could get business because, you know, I had knowledge, too, not because I'm a woman or I wore a skirt."  (Docket Entry No. 29, Ex. 36 at 145).  Ziegler also testified that she complained to Grahmann about Walker's comments, although she acknowledged that she "never specifically said which comments."  (*Id*. at 310–312).  Ziegler testified that she complained to Grahmann about one specific comment Walker made, the November 2003 comment about the sleeping arrangements at the ranch.  Ziegler testified that her other complaints were general and unspecific:  she told Grahmann that she "didn't appreciate [Walker]'s comments" and "I don't appreciate the comments he [Walker] makes to me sometimes."  (*Id*. at 310–312).  Ziegler testified that Grahmann responded by telling her that she was taking the comments too personally.  (*Id*. at 145–46, 310–11).  She also complained to Grahmann that she was not making enough money to pay for her bills and that she felt like she was "doing a lot and wasn't respected."  (*Id*. at 148).

Ziegler acknowledged in her deposition that she did not complain to Grahmann about Walker's unwanted shoulder rubs.  (Docket Entry No. 29, Ex. 36 at 310–12).  Ziegler testified that she did not complain to anyone but Grahmann.  Grahmann testified that Ziegler complained that she needed to make more money, but denied that Ziegler made any complaints to him about sexual harassment, including about any comments he or Walker made.  (Docket Entry No. 31, Ex. A at 32, 54).

12

Ziegler testified that the last inappropriate comment or touching was between November 10 and 14, 2003.  She turned in her resignation letter on January 5, 2004.  (Docket Entry No. 29, Ex. 36 at 184).  Ziegler decided to resign the day after a January 4, 2005 meeting at which Walker told Grahmann to tell two of Ziegler's larger customers that SDS would no longer deliver paperwork to them on a daily basis.  Ziegler had personally made these daily deliveries.  Ziegler testified that she was unhappy with how Walker had handled this and believed that he should have asked her rather than Grahmann to let the customers know.  (*Id.* at 183).  Ziegler testified that she chose to resign for a number of different reasons, including that she needed to make more money "to survive," that she needed health care benefits for herself and her daughter, that Walker wanted to stop operating the way Ziegler had been with some of her customers and instructed someone other than Ziegler to convey this to he customers, as well as the comments that had been made.  (*Id.* at 185).

### C.    The Evidence as to the Retaliation Claim

On January 5, 2004, Ziegler turned in her resignation, first to Grahmann, then to Walker.   The resignation letter was dated January 5, 2004 and said:

> Mr. J. H. Walker,
> Please except [sic] this as my two weeks notice.  I would like to
> thank you for the opportunity to work for your company.
> Sincerely,
> /s/
> Christy Hall

(Docket Entry No. 19, Ex. A at EEOC 00299).  Ziegler testified she told Grahmann that she was going to resign because of what had happened the day before in the meeting, the

comments that had been made, the money she made, and that she did not feel appreciated. (Docket Entry No. 29 at 186).  Grahmann disputed this account.  He testified that Ziegler said that she was resigning because of "the way she was being treated," which Grahmann interpreted to mean that "[s]he didn't like the way I was holding her accountable for her actions.  She was upset that I was making her come to work.  I was making her communicate with the office.  They were writing her up for not doing these things.  She was upset that she had to go through me whenever she wanted things.  She was upset that she did not have more access to [Walker]."  (Docket Entry No. 31, Ex. A at 54–55).  Grahmann testified that before her resignation, Ziegler had never complained about any type of harassment, including comments or unwanted touching, and that after she complained about her salary, she was given a raise.  Grahmann testified that Ziegler never complained about the way Walker treated her.  (*Id*. at 55–56).

Grahmann took Ziegler to meet with Walker.  Ziegler testified that before she could explain her reasons for resigning to Walker, he "started yelling and said, 'Well, I'm not going to let you stay two weeks.  You can leave immediately.'"  (*Id*. at 187–88).  Walker testified that when Ziegler offered her resignation, he said, "Hey, since you're going to go ahead and terminate, we'll just go ahead and make today your last day."  According to Walker, Ziegler "threw a temper tantrum" and said, "[y]ou can't do this and you don't have the right and you have to give me two weeks' notice."  (Docket Entry No. 29, Ex. 37 at 151–52).  Walker testified that Ziegler did not complain about her treatment at work when she resigned.  (*Id*. at 154).

14

Grahmann testified that Walker read the resignation letter and said that "there was no use in even doing the two weeks." According to Grahmann, Ziegler "got pretty upset and starting quoting what she believed was the law" and "left the room bawling." (Docket Entry No. 31, Ex. A at 56–57). Ziegler was not allowed to work during the two weeks after her resignation, and she was not paid for those weeks. (Docket Entry No. 33, Ex. A at 28–29). The EEOC asserted that the refusal to allow Ziegler to work and be paid for the two weeks after her notice of resignation amounted to termination and was in retaliation for her complaints.

### D.    The Evidence as to the Events Following Ziegler's Resignation

On the day Ziegler resigned, she filed a claim for unemployment benefits with the Texas Workforce Commission. Ziegler told the Commission that she quit because of her treatment, her pay, and her healthcare benefits, but did not mention any sexual harassment. (*Id*. at 189–91). Ziegler started working for another delivery company, Mustang Delivery, one week later. (*Id*. at 192). At Mustang Delivery, most of Ziegler's customers were clients she had worked with at SDS. In March 2004, J. H. Walker filed a state-court lawsuit against Mustang Delivery and Ziegler seeking to enjoin them from doing business with customers Ziegler had dealt with at SDS based on an alleged noncompete agreement. (Docket Entry No. 19, Ex. A at EEOC 00211). Mustang Delivery and J.H. Walker reached a settlement under which Mustang Delivery agreed not to contact or do business with the clients that Ziegler had dealt with at SDS. Ziegler testified that after she lost those accounts, she had a number of difficulties at Mustang Delivery. She accused the president of Mustang Delivery

of making a deal with Walker to let her go in exchange for dropping the lawsuit.  In response,

he stated that if she thought he was "in cahoots with Johnny Walker, we can't do business

any more."  (Docket Entry No. 29, at 33).  Ziegler left her job at Mustang Delivery on June

30, 2004.  (Docket Entry No. 29, Ex. 36 at 284, 286).

On July 22, 2004, Ziegler filed a complaint with the EEOC, alleging unequal pay and

sexual harassment by J. H. Walker.  (Docket Entry No. 29, Ex. 1).[2]  The EEOC began an

investigation, which resulted in this lawsuit.  (Docket Entry No. 29, Exs. 3, 30, 31, 41).

## II.    The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the

moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56(c).  The

movant bears the burden of identifying those portions of the record it believes demonstrate

the absence of a genuine issue of material fact."  *Lincoln General Ins. Co. v. Reyna*, 401 F.3d

(5th Cir. 2005) (citing  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  If the burden

of proof at trial lies with the nonmoving party, the movant may either (1) submit evidentiary

---

[2]  Ziegler alleged that after she left SDS, Walker made comments about her to others, including past and prospective clients.  She testified that Walker accused her of sleeping with a client's representative.  (*Id*. at 218 - 220, 230) ("That is when he insinuated I must have been doing something more than providing a service in order to get the business."  "[John Walker] basically accused me of sleeping with David Garcia.").  Ziegler testified that Walker made other inappropriate comments about her to third parties.  (Docket Entry No. 29, Ex. 26 at 208–212) ("Oh, you don't want to tell [sic] with her.  She's got baggage, she's a single parent, she's moved in with her boyfriend."  "[John Walker] said, 'Well, if that bitch Christy would stop fucking Joe Walls, then we wouldn't have a problem.").  Walker denied making any of these comments.  (Docket Entry No. 29, Ex. 37 at 77).  Ziegler counterclaimed against Walker for defamation in the state-court lawsuit.  The EEOC has not alleged or argued in any of its briefs that these comments were in retaliation for Ziegler's protected activity.

documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently supports an essential element or claim. *Celotex*, 477 U.S. at 330. The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case. *Bourdeaux v. Swift Transp. Co., Inc.,* 402 F.3d 536, 540 (5th Cir. 2005). "An issue is material if its resolution could affect the outcome of the action." *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 535 (5th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response. *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim. *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 305 (5th Cir. 2004). This burden is not satisfied by "some metaphysical doubt as to the material facts," "conclusory allegations," "unsubstantiated assertions," or "only a scintilla of evidence." *Young v. Exxonmobil Corp.*, 155 Fed. Appx. 798, 800 (5th Cir. 2005).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Anderson,* 477 U.S. at 255; *Young*, 155 Fed. Appx. at 800. "Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Beard v. Banks*, 126 S.Ct. 2572, 2578 (2006) (quoting *Celotex*, 477 U.S. at 322).

## III.   The Summary Judgment Evidence and Objections

The summary judgment evidence includes the deposition of Christy Ziegler, including the attachments to that deposition,[3] Ziegler's affidavit,[4] Ziegler's complaint to the EEOC,[5] the EEOC's determination letter,[6] affidavits from Raymond Bautista, an EEOC investigator,[7] Jeanette Linio, the District Director of the Houston District Office of the EEOC,[8] and Rudy Sustaita, an attorney for the EEOC,[9] two memoranda from the EEOC investigation,[10] J. H.

---

[3]  Docket Entry No. 19, Ex. A; Docket Entry No. 29, Ex. 36.

[4]  Docket Entry No. 29, Ex. 39.

[5]  Docket Entry No. 29, Exs. 1, 2, 2A.

[6]  Docket Entry No. 29, Ex. 3.

[7]  Docket Entry No. 29, Ex. 38.

[8]  Docket Entry No. 29, Ex. 40.

[9]  Docket Entry No. 29, Ex. 41.

[10]  Docket Entry No. 29, Ex. 30–31.

18

Walker's answers to the EEOC's first set of interrogatories,[11] J. H. Walker's response to the EEOC's first and second requests for production,[12] and answers to the EEOC's first request for admissions.[13] The record also includes J. H. Walker's advertising for the employment and related records,[14] the job descriptions,[15] a list of staff by position, gender, and salary,[16] a list of staff termination history,[17] SDS's employee listing,[18] J. H. Walker's employee manual,[19] Ziegler's cover letter and the resume she submitted when she was hired in February 2003,[20] Ziegler's employment application,[21] Ziegler's interview questions and ratings,[22]

---

[11] Docket Entry No. 29, Ex. 32.

[12] Docket Entry No. 29, Ex. 33–34.

[13] Docket Entry No. 29, Ex. 35.

[14] Docket Entry No. 29, Ex. 4.

[15] Docket Entry No. 29, Ex. 23.

[16] Docket Entry No. 29, Ex. 26.

[17] Docket Entry No. 29, Ex. 27.

[18] Docket Entry No. 29, Ex. 29.

[19] Docket Entry No. 29, Ex. 28.

[20] Docket Entry No. 29, Exs. 5, 5A.

[21] Docket Entry No. 29, Ex. 6.

[22] Docket Entry No. 29, Ex. 7–9.

Ziegler's employee profile,[23] Ziegler's personnel form,[24] and Ziegler's employee history.[25] The record also includes documents related to Hoover, the male salesperson hired on the same day Ziegler was hired.   The record includes Hoover's cover letter, resume, and application,[26] Hoover's interview questions and ratings,[27] Hoover's vacation requests,[28] Hoover's personnel form,[29] Hoover's employee profile,[30] and Hoover's employee history.[31] The parties have also submitted depositions of Kevin Mullen, J. H. Walker's director of safety and personnel,[32] and Mark Grahmann, Ziegler's supervisor, who worked in sales and as operations manager for J. H. Walker,[33] and a declaration by Grahmann.[34]

The EEOC submitted as part of its summary judgment evidence Walker's deposition. The EEOC deposed Walker on September 14, 2006, after the company had moved for

---

[23]  Docket Entry No. 29, Ex. 10.

[24]  Docket Entry No. 29, Ex. 11.

[25]  Docket Entry No. 29, Ex.  22.

[26]  Docket Entry No. 29, Exs. 12–14.

[27]  Docket Entry No. 29, Exs. 15–18.

[28]  Docket Entry No. 29, Ex. 19.

[29]  Docket Entry No. 29, Ex. 20.

[30]  Docket Entry No. 29, Ex. 21.

[31]  Docket Entry No. 29, Ex. 24.

[32]  Docket Entry No. 31, Ex. B; Docket Entry No. 33, Ex. A.

[33]  Docket Entry No. 31, Ex. A.

[34]  Docket Entry No. 19, Ex. B.

summary judgment.[35]  On September 27, 2006, the EEOC filed its response to the summary

judgment motion, including Walker's deposition transcript.  On October 17, 2006, the

company submitted an errata sheet that Walker signed, making eight changes to his 240-page

deposition.[36]  The EEOC challenges five of the eight changes as impermissible under Rule

30(e) of the Federal Rules of Civil Procedure, moving to strike the changes.

Rule 30(e) states:

> If requested by the deponent or a party before completion of the
> deposition, the deponent shall have 30 days after being notified
> by the officer that the transcript or recording is available in
> which to review the transcript or recording and, if there are
> changes in form or substance, to sign a statement reciting such
> changes and the *493 reasons given by the deponent for making
> them.  The officer shall indicate in the certificate prescribed by
> subdivision (f)(1) whether any review was requested and, if so,
> shall append any changes made by the deponent during the
> period allowed.

FED. R. CIV. P. 30(e).

The cases are divided on the type of changes permitted under Rule 30(e).  A majority

view among federal decisions broadly interprets Rule 30(e) to permit the deponent to make

changes, even if they contradict the original answers.  *See Medina v. Horseshoe*

*Entertainment*, 2006 WL 2038057 (W.D. La. July 19, 2006) (allowing corrections, including

contradictions because "[u]nder the broad interpretation of Rule 30(e), though, these

contradictions and substantive alterations are permitted."); *Reilly v. TXU Corp.*, 230 F.R.D.

---

[35]  Docket Entry No. 29, Ex. 37.  This deposition is also at Docket Entry No. 37, Ex. A.

[36]  Docket Entry No. 33, Ex. B.

486, 490 (N.D. Tex. 2005) (the plaintiff was entitled to correct his deposition, even though the changes altered his testimony in substantive and even contradictory respects, but defendants could then inquire about the reasons for the changes, ask follow-up questions, and submit an application for reasonable attorneys' fees); *Agrizap, Inc. v. Woodstream Corp.*, 232 F.R.D. 491, 493 (E.D. Pa. 2006) ("After satisfying the procedural requirements of Rule 30(e), the majority view among federal decisions interprets Rule 30(e) to permit the deponent to make any kind of changes (corrections based on a claim of transcription error, or any other substantive or procedural changes."); *Foutz v. Town of Vinton, Va.*, 211 F.R.D. 293 (W.D. Va. 2002); *DeLoach v. Philip Morris Companies, Inc.*, 206 F.R.D. 568, 571-72 (M.D.N.C. 2002); *Tingley Systems, Inc. v. CSC Consulting, Inc.*, 152 F. Supp. 2d 95, 120 (D. Mass. 2001); *Podell v. Citicorp Diners Club, Inc.,* 914 F. Supp. 1025, 1034 (S.D.N.Y. 1996); *United States v. Piqua Engineering, Inc.*, 152 F.R.D. 565 (D. Ohio 1993); *Lugtig v. Thomas*, 89 F.R.D. 639, 642 (N.D. Ill. 1981) (not examining the sufficiency, reasonableness, or legitimacy of the reason); *see generally* 8A Wright, Miller & Marcus, FEDERAL PRACTICE AND PROCEDURE, § 2118 at 134 (1994).  A minority view takes the position that corrections on errata sheets that alter the substance of the deponent's testimony are not permitted.  *See, e.g., Wigg v. Sioux Falls Sch. Dist. 49-5*, 274 F. Supp. 2d 1084, 1090-91 (D.S.D. 2003); *Duff v. Lobdell-Emery Mfg. Co.*, 926 F. Supp. 799, 803 (N.D. Ind. 1996); *S.E.C. v. Parkersburg Wireless Ltd. Liab. Co.*, 156 F.R.D. 529 533 & n. 11 (D.D.C. 1994); *Greenway v. International Paper*, 144 F.R.D. 322 (W.D. La. 1992) ("the Rule cannot be interpreted to allow one to alter what was said under oath. If that were the case, one could merely answer

22

the questions with no thought at all and then return home and plan artful responses. Depositions differ from interrogatories in that regard.  A deposition is not a take home examination."); *Saffa v. Oklahoma Oncology, Inc.*, 405 F. Supp. 2d 1280 (C.D. Okla. 2005) (witness's attempt to change her testimony to clarify her position was disregarded because the change was a material alternation of the deposition testimony).

The EEOC relies on *Greenway* to support its argument that Walker's changes to his deposition testimony exceed permissible limits because they are "material changes that alter testimony."  (Docket Entry No. 36 at 4).  In *Greenway*, the court held that a change in form is the correction of a typographical error or misspelling, while a change in substance is the correction of a transcription error.  Following *Greenway*, a witness can use errata sheets to correct testimony when the transcript does not accurately reflect what the witness said (or claims to have said), but  cannot use an errata sheet to change what he said to what he meant to say or what he wished he had said.  The *Greenway* approach has been described as a "growing minority view."  *Medina*, 2006 WL 2038057 at *3 (citing *Summerhouse v. HCA Health Servs.*, 216 F.R.D. 502-505-6 (D. Kan. 2003)).  In this case, the EEOC does not present evidence from the court reporter that the transcript as opposed to the errata sheet accurately reflected what Walker said. *See, e.g., Thorn v. Sundstrand Aerospace Corp.*, 207 F.3d 383 (7th Cir. 2000) (witness changed testimony on errata sheet based on asserted transcription error that made transcript "garbled"; court rejected the basis of change as an error in transcription because the court reporter submitted an affidavit stating that the testimony had been accurately transcribed).

23

Other courts have reached the same result as *Greenway* using slightly different reasoning. They conclude that an errata sheet that purports to change the substance of deposition testimony is no different from an affidavit that contradicts deposition testimony and should be treated the same way. In *Burns v. Bd. of County Comm'rs of Jackson County*, 330 F.3d 1275 (10th Cir. 2003), a witness had changed "no" answers to "yes" answers. The district court had disregarded the changes reflected in the errata and granted summary judgment to the other side based in part on the deposition answers. *Id.* at 1281. In affirming, the Tenth Circuit took the same approach it had taken in "sham affidavit" cases to determine whether the district court had properly disregarded the errata sheet. The court of appeals asked  whether the witness was cross-examined at deposition; whether the changes were based on newly discovered evidence; and whether the earlier deposition testimony reflected confusion which the errata sought to explain, concluding that the factors supported the district court's decision. *See also Wigg v. Sioux Falls School District*, 274 F. Supp. 2d 1084, 1091 (D. S.D. 2003) ("If a party were allowed to create material factual disputes by altering one's deposition testimony via an errata sheet, summary judgment would rarely, if ever, be granted").

Under the majority approach, a witness is free to make changes of "substance," not only changing but even contradicting the transcript. Under this approach, "[i]t is not necessary for the court to examine the sufficiency, reasonableness, or legitimacy of the reasons." *Foutz v. Town of Vinton, Virginia*, 211 F.R.D. 293, 295 (W.D. Va. 2002); *see also Colin v. Thompson*, 16 F.R.D. 194, 195 (W.D. Mo. 1954) (explaining that whether the

witness's "reasons are good or not will not impair his right to make the changes").  The fact and extent of the change are treated as subjects for impeachment that may affect the witness's credibility.  "The witness who changes his testimony on a material matter between the giving of his deposition and his appearance at trial may be impeached by his former answers, and the cross-examiner and the jury are likely to be keenly interested in the reasons he changed his testimony.  There is no apparent reason why the witness who changes his mind between the giving of the deposition and its transcription should stand in any better case." *Lugtig*, 89 F.R.D. at 642.  Courts taking this approach hold that the amended testimony does not replace the original testimony which remains part of the record on which the witness may be examined and impeached.  *See, e.g., Podell v. Citicorp Diners Club, Inc*., 112 F.3d 98, 103 (2d Cir. 1997) ("when a party amends his testimony under Rule 30(e), '[t]he original answer to the deposition questions will remain part of the record and can be read at the trial'") (citation omitted); *Medina*, 2006 WL 2038057 at *4 ("It should be noted that the original answers are not to be stricken, and that the Defendant may use the original answers for impeachment purposes where appropriate."); *Glenwood Farms, Inc. v. Ivey*, 229 F.R.D. 34 (D.C. Me. 2005) (plaintiffs could not prevent defendants from offering a deponent as an expert witness or have stricken the changes the witness made in his deposition, but the original testimony remained in the transcript).

Some courts treat errata sheets submitted after a summary judgment motion has been filed differently from errata sheets submitted before the filing of a summary judgment motion.  *See, e.g., Rios v. Welch*, 856 F. Supp. 1499, 1502 (D. Kan. 1994) ("It is the court's

belief that a plaintiff is not permitted to virtually rewrite portions of a deposition, particularly after the defendant has filed a summary judgment motion, simply by invoking the benefits of Rule 30(e).”); *DeLoach v. Philip Morris Companies, Inc.*, 206 F.R.D. 568, 573 (M.D.N.C. 2002) (changes reflected in the errata sheets did not contradict the prior deposition testimony, but instead “explained” or “clarified” deposition responses, which was permissible in part because “a motion for summary judgment is not yet on the horizon”).  In *Thorn v. Sundstrand Aerospace Corp.*, 207 F.3d 383, 389 (7th Cir. 2000), the court took an intermediate position, concluding that “by analogy to the cases which hold that a subsequent affidavit may not be used to contradict the witness's deposition . . . a change of substance which actually contradicts the transcript is impermissible unless it can plausibly be represented as the correction of an error in transcription, such as dropping a ‘not.’”

In this case, Walker made eight changes to his deposition transcript after the defendant’s lawyer had filed the summary judgment motion, but before the EEOC filed its response.  The EEOC challenges five of the changes.  Two of the changes concern questions of Walker about Ziegler’s supervisor, Grahmann, allegedly commenting to Ziegler about her ability to get customers because she was a woman and wore a skirt.  (Docket Entry No. 29, Ex. 10 at 70, 74, 75–76).  In response to a question about what another individual would know about Ziegler’s allegations,  Walker testified: “Well, I just don’t know—well, here’s what you have to go back—and I have to say none, I guess, because none of these allegations were ever made while she worked for us.  I mean, there was never any allegations.  She never went to him.  She never went to anybody, to my knowledge, about—*other than the one time,*

*I think, she said something about Mark making a comment about her being able to get business."* (Docket Entry No. 29, Ex. 10 at 70, l. 11-22).  In the errata sheet, Walker changed the italicized words to "*other than her saying that Mark made a comment about being able to obtain business at one of her depositions*."  Walker continued his answer by saying, according to the transcript, "And that—you know, *that's just kind of Mark as*—that's a smiling comment, 'Oh, you know, you're just so good looking, you can get business where I can't get it, maybe.'" (*Id*. at l. 19).  In his errata sheet, he changed the italicized portion to read, "*And that—you know, that's just what she said Mark said*."  Walker gave as reasons "clarify and correct testimony."

Under the majority view, these changes would be permissible under Rule 30(e).  Under a somewhat more restrictive view, articulated in *Thorn v. Sundstrand Aerospace Corp*., 207 F.3d 383, 389 (7th Cir. 2000), the changes from what the witness said to what he wanted to say – such as inserting the words "at one of her depositions" – unaccompanied by any evidence of a corresponding transcription error would be impermissible.  Under the former approach, the original version would remain part of the record.  For the purposes of deciding the summary judgment motion, this court would not disregard the uncorrected testimony.  Nor would the court resolve the factual inconsistency between the two versions.  Instead, the court would take the disputed evidence in the light most favorable to the nonmovant.  *Id.* at 386.

The EEOC also challenges Walker's correction to an answer he gave in response to a question about whether Grahmann denied telling Ziegler that she could sell or get

customers because she was an attractive woman and wore a skirt.  The transcript records John Walker's answer as "*No, I don't think Mark would deny that, that he said that*." (Docket Entry No. 29 at 76, l. 2-3, 6).  The correction changed the answer to: *"No I don't think Mark would say that."*  Under the majority view of Rule 30(e), this change would be permissible, with the factfinder entitled to consider the original transcript as well.  Under a more restrictive view, it would not be permissible, because it makes a substantive change with no indication that the original version was incorrectly transcribed.  Indeed, the remainder to the answer is consistent with the original transcript.  The rest of the answer describes why the statement is not discriminatory and therefore why Walker believed Grahmann could have said it.  (*Id.* at 76, ll. 3-25, p. 77, l. 1-13).  Under either version, this court would not disregard either the original or corrected testimony, but would consider the testimony in the light most favorable to the EEOC in considering the summary judgment motion.

The EEOC also challenges Walker's change in his testimony about the consideration given to the educational background of both Ziegler and another employee, Hoover.  Walker was asked whether he thought Hoover's "degree in finance is relevant to the sales position he held."  Walker answered that he thought "it's irrelevant."  (Docket Entry No. 29, Ex. 11 at 198, l. 10).  In his errata sheet, he inserted the words "what his major was" after "it's irrelevant."  The EEOC's objection is without merit, even under a more stringent approach to Rule 30(e).  The transcript makes it clear that the subject of the discussion was Hoover's educational background, which included that he had "majored in finance" and obtained a

degree with that major.  It was clear that Walker was referring to a degree with a major in finance in his answers.  There is no contradiction.

Finally, the EEOC objects to Walker's changing his answer, "No" to the question asking whether he was partly responsible for salary increase received by others, to "Yes." Walker stated that he made the change because he misunderstood the question.  Either version is consistent with the other relevant testimony.  This court considers both the changed and original transcripts, taking the evidence in the light most favorable to the EEOC in resolving the summary judgment motion.

## IV.  Analysis

### A.    The Unequal Pay Claims

Under Title VII, it is unlawful "to discriminate against any individual with respect to his compensation . . . because of such individual's sex." 42 U.S.C. § 2000e-2(a); *Siler-Khodr v. University of Texas Health Science Center San Antonio,* 261 F.3d 542, 546 (5th Cir. 2001) (citing *Uviedo v. Steves Sash & Door Co.*, 738 F.2d 1425, 1431 (5th Cir.1984); *Pittman v. Hattiesburg Mun. Separate Sch. Dist.*, 644 F.2d 1071 (5th Cir.1981)); *Montgomery v. Clayton Homes, Inc*., 2003 WL 1922917, at *1 (5th Cir. 2003).  "Hence, a Title VII claim alleges 'individual, disparate treatment.'"  *Siler-Khodr*, 261 F.3d at 545 (citing *Plemer v. Parsons-Gilbane*, 713 F.2d 1127, 1135 (5th Cir. 1983)).  A female plaintiff's job need not be identical to a higher-paid male employee's, but the "skill, effort and responsibility" required to perform the compared jobs must be "substantially equal." *Looper v. City of Dallas*, 1999 WL 222355, at *2 (N.D. Tex. Apr. 8, 1999) (citing *Peters v. City of Shreveport*,

818 F .2d 1148, 1153 (5th Cir.1987)); *Corning Glass Works v. Brennan*, 417 U.S. 188, 196 (1974) (The plaintiff must show "equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.").  Under Title VII, after a "*prima facie* case is established, the employer has an opportunity to articulate a legitimate, non-discriminatory reason for the adverse employment action.  Once the employer offers evidence of such a legitimate reason, the burden shifts back to the plaintiff-employee to raise a genuine issue of material fact that this non-discriminatory reason is merely pretextual."  *Willis v. Coca Cola Enterprises, Inc.*, 445 F.3d 412, 420 (5th Cir. 2006) (citations omitted).

Under the EPA, an employer may not discriminate "between employees on the basis of sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions."  29 U.S.C. § 206(d)(1); *Siler-Khodr*, 261 F.3d at 546;.  The EPA "demands that equal wages reward equal work."  *Siler-Khodr*, 261 F.3d at 546 (citing *Corning Glass Works*, 417 U.S. at 195).  Under the EPA, after "a plaintiff has made her *prima facie* case by showing that an employer compensates employees differently for equal work, the burden shifts to the defendant to 'prove by a preponderance of the evidence that the wage differential is justified under one of the four affirmative defenses set forth in the Equal Pay Act: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any other factor than sex.'"  *Id.* (citing *Kovacevich v. Kent State Univ.*, 224 F.3d 806, 826 (6th Cir. 2000); 29 U.S.C. § 206(d)(1)).   The EPA's affirmative defenses have been

incorporated into Title VII; generally "a Title VII claim of wage discrimination parallels that of an EPA violation." *Id.*

The parties do not dispute that Ziegler is a member of a protected class and that she was hired at the same time as a higher-paid male employee.  The EEOC claims that Ziegler's sales job was identical to Hoover's but that she was paid less from February 2003 to October 2003.  (Docket Entry No. 28 at 10–13).  The EEOC claims that the Sales I and Sales II distinction is a sham created after the EEOC investigation and that Hoover's education and experience cannot justify a higher salary.  (*Id.*).  J. H. Walker responds that Hoover's job was different than Ziegler's and required more responsibilities and that Hoover had two years of experience and a college degree that Ziegler lacked.  (Docket Entry No. 19 at 2, 5–6).

The EEOC has made a *prima facie* showing.  Although the record shows that Ziegler and Hoover had some different job responsibilities, a *prima facie* case does not require a showing that the jobs are identical.  *Corning Glass Works*, 417 U.S. at 196.  The job descriptions, other documents, and testimony from Ziegler, Grahmann, Mullen, and Walker show that while Hoover's job was different from Ziegler's in that it required managerial or supervisory responsibilities that Ziegler did not have, these responsibilities were incidental to the primary sales duties.  (Docket Entry No. 29, Exs. 23, 25, 36, 37; Docket Entry No. 31, Exs. 1, 2).  Grahmann testified that he assigned managerial tasks to Hoover only when Grahmann was unavailable, (Docket Entry No. 31, Ex. A at 32–38).  Walker gave consistent testimony.  (Docket Entry No. 29, Ex. 37 at 206, 215).  The job descriptions Mullen testified he wrote in February 2003 show that Hoover had some management responsibilities but does

31

not show that these were anything but sporadic duties.  (Docket Entry No. 29, Ex. 23, 25; Docket Entry No. 31, Ex. B at 55).  Hoover and Ziegler had sales jobs involving substantially the same responsibilities.  (Docket Entry No. 28 at 6).

A defendant may justify a pay disparity if it is based on "factors other than sex."  29 U.S.C. § 206(d)(1).  J. H. Walker asserts that Hoover had more sales experience than Ziegler and that Hoover had a college degree, relying on experience and education as factors other than sex that are legitimate nondiscriminatory reasons for the pay difference.  The EEOC asserts that there are fact issues that preclude summary judgment as to these proffered reasons.

The EEOC argues that Walker admitted in his deposition that Hoover's degree was irrelevant to the sales job.  (Docket Entry No. 28 at 10).  Walker did not testify that a degree was irrelevant to the sales job.  Rather, he testified that Hoover's major was irrelevant.  (Docket Entry No. 29, Ex. 37 at 188–89).  This evidence does not raise a fact issue as to liability for disparate pay.

The EEOC contends that during the initial EEOC investigation, Walker said that a college degree was "not required" for the sales positions.  (Docket Entry No. 29, Exs. 30, 31, 38).  Walker denies making this statement.  Taking the evidence in the light most favorable to the EEOC, this does not raise a fact issue.  Walker's statement that a degree is "not required" is consistent with his later testimony that education and experience are both important factors but that a high-performing or highly experienced salesmen can be hired or promoted even without a degree.  (Docket Entry No. 29, Ex. 37 at 92–93, 97–98).  Walker

32

testified that it was "unusual" to "hire anybody without a college education" in his increasingly regulated and complex business.  (Docket Entry No. 29, Ex. 37 at 92–93).  Walker's statement that a college degree was preferred but "not required" is also consistent with the evidence as to the J. H. Walker's advertisements for the sales work.  J. H. Walker purchased at least twelve advertisements for the sales position.  (Docket Entry No. 29, Ex. 4).  Four newspaper ads stated: "Salary commensurate with experience."  (*Id*. at 1, 2, 5, 7).  Two electronic advertisements stated, "Bachelor's degree required"; another stated "Competitive salary commensurate with experience."  (*Id*. at 9–10, 12).  One electronic advertisement stated that a degree was "desired" and that the salary was "negotiable."  (*Id*. at 11).  Another electronic advertisement stated: "Pay commensurate with experience."  (*Id*. at 13).  Yet another electronic advertisement stated: "Degree-level.  Entry jobs require little or no experience.  Alumni positions.  Require a college degree and experience.  Non-degree, full-time.  Full-time jobs that do not require a college degree."  (*Id*. at 14).  An information sheet that J. H. Walker submitted to an employee service stated that the pay was "NEGOTIABLE/PAY FOR EXPERIENCE," that education was "FLEXIBLE," and that experience was "PREFERABLE- WILL TRAIN."  (*Id*. at 15).

The record shows that Hoover had almost two years of sales experience, while Ziegler had one year or less.  The EEOC claims that Hoover's experience was inferior because it was not with large-scale accounts and was in the "cloistered confines of a university setting." (Docket Entry No. 28 at 10).  Walker testified that he did not consider Ziegler's five months working in sales at the airline cargo company relevant because she "actually didn't make any

33

outside sales calls there."  (Docket Entry No. 29, Ex. 37 at 239).  Walker did consider Hoover's two years of sales experience at the major university newspaper to be relevant experience.  (Docket Entry No. 29, Ex. 37 at 172–73).

Courts "are not permitted to substitute their judgment for the judgment of the employer . . . who [has] established and applied a bona fide job rating system, so long as it does not discriminate on the basis of sex."  *Washington County v. Gunther*, 452 U.S. 161, 170-71 (1981) (citations omitted).  J. H. Walker has shown that Hoover's experience and education are "factors other than sex" that account for the compensation difference in this case.  *See also Merillat v. Metal Spinners, Inc.*, 2006 WL 3499941, at *9 (7th Cir. Dec. 6, 2006) ("Under the EPA, differences in education and experience may be considered factors other than sex."); *Phillips v. TXU Corp.*, 194 Fed. Appx. 221 (5th Cir. 2006) (employee failed to show that education and experience compensation difference was a pretext); *Hutchins v. Int'l Broth. of Teamsters*, 177 F.3d 1076 (8th Cir. 1999) ("A differential that is based on education or experience is a factor other than sex recognized by the Equal Pay Act."); *Stanley v. University of Southern California*, 178 F.3d 1069,. 1075 (9th Cir. 1999) ("By alleging that the pay differential at issue here was due to . . . markedly different levels of experience and qualifications, the defendants have proffered a factor 'other than sex.'").

The EEOC argues that the fact that Ziegler had her salary increased from $32,000 to $36,000 in October 2003 shows that she was not in a Sales I position because that salary exceeded the top range identified in the February 2003 job description.  It is unclear whether the salary ranges identified are for beginning salaries.  Ziegler had complained that she was

not making enough money and that her rate of production justified a higher salary. In October 2003, Walker accepted Grahmann's recommendation to give Ziegler a raise, bringing her annual salary up to Hoover's. Walker testified that when Ziegler was given a promotion it was justified by her sales performance, which at that point equaled or exceeded Hoover's. (Docket Entry No. 29 at 110, 111 - 112). The EEOC's argument does not raise a fact issue as to the compensation discrimination claim.

Summary judgment is granted as to the compensation discrimination claims under Title VII and the EPA.

### B.    The Sexual Harassment Claims

In a Title VII sexual harassment suit, the elements of a *prima facie* case are that: (1) the plaintiff belongs to a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on sex; and the (4) the harassment complained of affected a "term, condition or privilege of employment." *Harvill v. Westward Commn's, L.L.C.*, 433 F.3d 428, 434 (5th Cir. 2005); *see also Ackel v. National Communications, Inc.*, 339 F.3d 376, 381 (5th Cir. 2003) (citing *Watts v. Kroger Co.*, 170 F.3d 505, 509 (5th Cir. 1999)). If the plaintiff alleges that the harassment culminated in a tangible employment action, such as discharge, demotion, or reassignment, the employer may be vicariously liable for the harassment. If  no such tangible employment action is alleged, the issue is whether the harassment was sufficiently severe or pervasive as to alter a term or condition of employment. *See Burlington Indus. v. Ellerth*. 524 U.S. 742, 753-54,(1998); *see also Jones v. Flagship Int'l*, 793 F.2d 714, 719-20, 721-22 (5th Cir. 1986).

An employer may be vicariously liable on a finding that it took a tangible employment action toward an employee who either accepted or rejected a supervisor's sexual harassment. Such an employer is conclusively presumed to have had notice of the offending supervisor's conduct and will not be permitted to advance the affirmative defense the Supreme Court set out in *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). In contrast, an employer that is found not to have taken a tangible employment action toward the harassed employee but is found to have maintained a hostile work environment by virtue of severe or pervasive supervisor sexual harassment may ordinarily advance the *Ellerth/Faragher* affirmative defense. "When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence. *See* FED. R. CIV. P. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807; *see also Casiano v. AT&T Corp.*, 213 F.3d 278, 284 (5th Cir. 2000) (explaining that a finding of hostile environment will not result in vicarious liability if the employer can prove that it "exercised reasonable care to prevent and correct promptly any sexual harassment, and . . . the employee unreasonably failed to take advantage of any preventative or corrective

opportunities provided by the employer or to avoid harm otherwise," but that this affirmative defense is not available to an employer that has taken a tangible employment action).

The EEOC does not allege that the sexual harassment at issue culminated in a tangible employment action. Instead, the EEOC contends that the sexual harassment caused a hostile working environment and that the affirmative defense is not available.

### 1.    A Hostile Work Environment

For supervisor sexual harassment to be actionable as a hostile work environment claim, it must be "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment." *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67 (1986). "To be actionable, the challenged conduct must be both objectively offensive, meaning that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so." *Harvill*, 433 F.3d at 434 (citing *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 874 (5th Cir.1999)). Determining whether an environment is offensive or abusive requires an *ad hoc* analysis, focusing on factors such as the frequency of the conduct, the severity of the conduct, the degree to which the conduct is physically threatening or humiliating, and the degree to which the conduct unreasonably interferes with an employee's work performance. "[W]hether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.* 510 U.S.

17, 23 (1993).  The Supreme Court has repeatedly stated that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"  *Faragher*, 524 U.S. at 788 (citing *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 82 (1998)).

Ziegler worked for J. H. Walker for eleven months.  She alleged several explicitly sexual comments by  Walker—he invited her to ride in his boat topless, he invited her to sleep in his bed during a company sales meeting, and he asked her for a back rub—and alleged that Walker made inappropriate comments to her tattoo and her sexual relationships. Ziegler also alleged that Walker gave her unwanted shoulder rubs sixteen to twenty times. Ziegler claimed that these actions interfered with her ability to work.  Ziegler also alleged that her immediate supervisor, Grahmann, repeatedly told her that she had an advantage in her sales job because she is female and could wear skirts.  The evidence is vigorously disputed, but the credibility judgments necessary to resolve the disputes are not appropriate at the summary judgment stage.  The evidence must be taken in the light most favorable to the EEOC.  The evidence as to the comments by Walker combined with the evidence as to his frequent unwanted touching does raise a fact issue as to whether the harassment was severe or pervasive.

J. H. Walker cites to *Shepherd v. Comptroller of Public Accounts of State of Texas*, 168 F.3d 871 (5th Cir.1999).  In that case the plaintiff, Shepherd, made the following allegations about Moore, a coworker:

According to Shepherd's deposition, on one occasion Moore stood in front of Shepherd's desk and remarked "your elbows are the same color as your nipples."  Shepherd testified that Moore remarked once "you have big thighs" while he simulated looking under her dress.  Shepherd claimed Moore stood over her desk on several occasions and attempted to look down her clothing.  According to Shepherd, Moore touched her arm on several occasions, rubbing one of his hands from her shoulder down to her wrist while standing beside her.  Shepherd alleged additionally that on two occasions, when Shepherd looked for a seat after coming in late to an office meeting, Moore patted his lap and remarked "here's your seat."

*Id.* at 872.  The Fifth Circuit affirmed the district court's summary judgment, finding "each comment made by Moore to be the equivalent of a mere utterance of an epithet that engender offensive feelings."  *Id.* at 874.  However, the court noted that more "serious" comments can alter working conditions, citing *Farpella-Crosby v. Horizon Health Care*, 97 F.3d 803, 806 (5th Cir. 1996) (finding that frequent egregious comments about sexual proclivity created a hostile environment); *cf. Long v. Eastfield College*, 88 F.3d 300, 309 (5th Cir. 1996) (finding single joke involving condoms insufficient to create hostile environment); *see also Harris*, 433 F.3d at 435 ("[I]solated incidents, if egregious, can alter the terms and conditions of employment.") (citing *Faragher*, 524 U.S. at 788).

The EEOC cites cases finding fact issues as to whether the combination of sexually suggestive comments and unwanted touching constituted severe or pervasive harassment. In *Gentry v. Export Packaging Company*, 238 F.3d 842 (7th Cir. 2001), the plaintiff testified that over four months her manager gave her hugs, shoulder rubs, a kiss on her cheek, patted her cheek twice, and made several offensive comments.  In *Thomas v. Willie G's Post Oak,*

*Inc.*, 2006 WL 1117959 (S.D. Tex. April 25, 2006), the plaintiff presented evidence that his manager touched his buttocks twice and four or five times touched his arm muscles or rubbed his shoulders.  In *Clardy v. Silverleaf Resorts, Inc.*, 2001 WL 1295480 (N.D. Tex. Oct. 10, 2001), the plaintiff testified that her manager made vulgar comments and put his hands on her neck and back and frequently gave her shoulder rubs.  *Id.* at *8.  *See also Kenyon v. Western Extrusions Corp.*, 2000 WL 12902 at *5–6 (N.D. Tex. Jan. 6, 2000) (denying summary judgment for defendant based on evidence of supervisor's comments and rubbing against the plaintiff as she sat at her desk).

This case is not as extreme as many of the cases J. H. Walker cites.  But the evidence of both sexually offensive comments to Ziegler and sexually inappropriate touching, by the president and owner of the employer, raises a fact issue as to whether the conduct was so severe or pervasive as to change the terms and conditions of Ziegler's employment.  The Supreme Court has recognized that sexual harassment by a supervisor can be more severe than similar conduct by a coworker.   "When a person with supervisory authority discriminates in the terms and conditions of subordinates' employment, his actions necessarily draw upon his superior position over the people who report to him, or those under them, whereas an employee generally cannot check a supervisor's abusive conduct the same way that she might deal with abuse from a co-worker."  *Faragher*, 524 U.S. at 803.  In this case, the alleged harassment was by Ziegler's immediate supervisor as well as by the president and owner of the company.  The EEOC has raised fact issues as to whether the harassing conduct alleged was severe or pervasive that preclude summary judgment.

40

2.    *The Availability of the Affirmative Defense*

J. H. Walker asserts that it is entitled to summary judgment on the basis that Ziegler

failed to complain under the procedure set out in the employee handbook.  The Fifth Circuit

has held that if the alleged harasser is the president of the corporate employer when the

actionable conduct occurred, the affirmative defense cannot be raised.  In *Ackel v. National*

*Communications, Inc*., 339 F.3d 376 (5th Cir. 2003), the court stated:

> We read the Supreme Court's opinions in *Faragher* and *Ellerth*
> as the Seventh Circuit did in *Johnson v. West*, 218 F.3d 725, 730
> (7th Cir.2000), that the employer is vicariously liable for its
> employees activities in two types of situations: (1) there is a
> tangible employment action or (2) the harassing employee is a
> proxy for the employer.

Under this approach, the *Ellerth/Faraghe*r defense is not available when  the acts alleged to

constitute sexual harassment are committed by the president of the corporation.  J. H. Walker

is not entitled to raise the affirmative defense that it acted reasonably to prevent and correct

its president's sexually harassing behavior, or that the employee failed to make use of an

internal mechanism provided by it to prevent or correct the sexually harassing behavior.

*Ackel*, 339 F.3d at 383.

The defendants cite *Gearhart v. Eye Care Centers of America, Inc*., 888 F. Supp. 814

(S.D. Tex. 1995), in which a court granted summary judgment for an employer despite

evidence of a number of offensive incidents.  In that case, however, the court applied the

affirmative defense and found that the complaining plaintiff had failed to report the incidents

to her employer.  *Id.* at 826.  In this case, the alleged harasser, Walker, is the founder and

president of the defendant company.  The evidence shows that he made the hiring decisions and the compensation decisions.  "Vicarious liability automatically applies when the harassing supervisor is . . . 'indisputably within that class of an employer organization's officials who may be treated as the organization's proxy.'"  *Ackel*, 399 F.3d at 383 (citing *Faragher*, 524 U.S. at 789).

J. H. Walker's motion for summary judgment on the sexual harassment claim is denied.[37]

## C.    The Retaliation Claim

Title VII makes it an unlawful employment practice for an employer to "discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a

---

[37]  The EEOC does not appear to argue that Ziegler was constructively discharged as a result of the alleged sexual harassment.  To show constructive discharge because of sexual harassment requires proof "that 'working conditions would have been so difficult or unpleasant that a reasonable person in [her] shoes would have felt compelled to resign.'"  *Harvill*, 433 F.3d at 440 (citing *Landgraf v. USI Film Products*, 968 F.2d 427, 429-30 (5th Cir.1992).  "In determining whether a reasonable employee would feel compelled to resign, we have considered the relevancy of the following events: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement [or continued employment on terms less favorable than the employee's former status]."  *Id.* (citing *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir.2001)).  Constructive discharge by sexual harassment "must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment."  *Id.* (citing *Landgraf*, 968 F.2d at 430).  Ziegler admitted that no sexual harassment occurred after the sales meeting between November 10 and November 14, 2003.  She did not resign until January 2004.  (Docket Entry No. 29, Ex. 36 at 184).  Ziegler testified that she chose to resign for a number of different reasons, including a need to make more money and to get better healthcare benefits.  Shortly after Ziegler resigned, she told the Texas Unemployment Commission that she quit because of her general treatment, her level of pay, and her healthcare benefits.  (*Id.* at 189–192).  The EEOC has not identified evidence that raises a fact issue as to constructive discharge based on a sexually hostile work environment.

charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a) (1994). To make a *prima facie* case of retaliation under either Title VII or section 1981, a plaintiff must show that: (1) she engaged in an activity protected by Title VII; (2) she was subjected to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action." *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 319 (5th Cir. 2004). The *McDonnell Douglas* framework applies to Title VII retaliation claims. Under that framework, the employee's ultimate burden is to prove that the employer's stated reason for the adverse action was merely a pretext for the real, retaliatory purpose. If a plaintiff makes a *prima facie* showing, the burden shifts to the defendant to proffer a legitimate rationale for the underlying employment action. If the defendant makes this showing, the burden shifts back to the plaintiff to demonstrate that the employer's articulated reason for the employment action was a pretext for retaliation. *Id.* The standard of proof on the causation element of a Title VII retaliation claim is that the adverse employment action taken against the plaintiff would not have occurred "but for" her protected conduct. *Septimus v. Univ. of Houston*, 399 F.3d 601 (5th Cir. 2005); *Pineda v. United Parcel Serv., Inc.*, 360 F.3d 483, 487 (5th Cir. 2004).

In *Burlington*, the Supreme Court held that the antiretaliation provision of Title VII is not limited to discriminatory actions that affect the terms and conditions of employment. *Burlington Northern & Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2414 (2006). "The anti-retaliation provision protects an individual not from all retaliation, but from retaliation

that produces an injury or harm." *Id.*  "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 2420 (quotations omitted).  The standard for harm is objective.  *Id.* at 2407.  The harm must be material; Title VII does not protect an employee from trivial harms, "petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* at 2415.  The significance of any given act of retaliation depends upon the particular circumstances of the individual employee.  *Id.* at 2415.

Under Title VII, an employee has engaged in protected activity if he or she has (1) "opposed any practice made an unlawful employment practice by this subchapter," or (2) "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  2 U.S.C. § 2000e-3(a) (cited by *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 427–28 (5th Cir. 2000)).  To satisfy the 'opposition clause,' [the plaintiff] need not prove that [his employer's] practices were actually unlawful, but only that he had 'a reasonable belief that the employer was engaged in unlawful employment practices.'" *Byers*, 209 F.3d at 428 (citing *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1140 (5th Cir.1981), *cert. denied,* 455 U.S. 1000 (1982)).

The EEOC claims that Ziegler was "fired in retaliation for opposing gender-based treatment" because she was not allowed to work two additional weeks after her resignation.  (Docket Entry No. 28 at 23).  J. H. Walker argues that Ziegler did not "oppose" sex

discrimination because her complaints were too vague and general.  (Docket Entry No. 19 at 17).

The record does not support a finding that, as a matter of law, Ziegler did not engage in protected conduct.  Ziegler testified that she complained to her immediate supervisor, Grahmann, about harassing comments by both Walker and Grahmann.  Ziegler testified that she complained to Grahmann about his comments about the sales advantages of being female and wearing a skirt.  (Docket Entry No. 29, Ex. 36 at 145–46).  Ziegler also testified that she complained to Grahmann about comments made by Walker, although with one exception she was not specific about the comments.  (*Id*. at 310–312).  Taking the evidence in the light most favorable to the EEOC, Ziegler opposed sex-based discrimination by complaining to Grahmann.

The causal link required by the third prong of the *prima facie* case does not rise to the level of a "but for" standard.  *Raggs*, 278 F.3d at 471.  "The plaintiff 'need not prove that her protected activity was the sole factor motivating the employer's challenged decision in order to establish the 'causal link' element of a *prima facie* case.'"  *Gee v. Principi,* 289 F.3d 342, 345 (5th Cir. 2002) (quoting *Long v. Eastfield Coll.*, 88 F.3d 300, 305 n.4 (5th Cir. 1996) (additional citations omitted)); *accord, Toennies*, 47 S.W.3d at 479–80.  If the plaintiff presents evidence that supports the *prima facie* case with evidence that the reasons given by the employer for the adverse employment action were pretextual, a jury may infer the existence of retaliation.  "A 'causal link' is established when the evidence demonstrates that the employer's decision to terminate was in part on knowledge of the employee's protected

45

activity." *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir.2001). "If an employer

is unaware of an employee's protected conduct at the time of the adverse employment action,

the employer plainly could not have retaliated against the employee based on that conduct."

*Chaney v. New Orleans Public Facility Management, Inc.*,179 F.3d 164, 168 (5th Cir. 1999)

(citing *Grizzle v. Travelers Health Network, Inc*., 14 F.3d 261, 267 (5th Cir.1994)); *see also*

*Ackel*, 339 F.3d at 386.

It is undisputed that Walker decided that Ziegler's resignation would be effective

immediately and that she would not be allowed to work for two additional weeks. (Docket

Entry No. 19 at 24–25). The EEOC claims that Walker's decision was in retaliation for

Ziegler's complaints about discrimination and harassment. (Docket Entry No. 28 at 27). The

EEOC also points to Ziegler's testimony that Walker refused to pay her for some days she

had taken off in 2003 and to repay her for some cupcakes purchased for the office. Walker

testified that the company policy is to terminate salespeople on the date they turn in their

resignation, on the theory that such a salesperson is unlikely to "tell our customers how great

we are," but instead let customers know about their next employment. (Docket Entry No.

29 at 150 - 151). Walker disputed that under company policy, Ziegler was to be paid for the

days she had taken off in 2003.

The EEOC's argument that Walker "fired" Ziegler by accepting the resignation

immediately, as opposed to allowing her to work for two more weeks, is unpersuasive. The

evidence is undisputed that Ziegler had voluntarily decided to resign for a number of

different reasons, including that she wanted to make more money, she wanted better health

care benefits, she was unhappy with the meeting the day before, as well as "comments." (Docket Entry No. 29, Ex. 36. at 185–86). Shortly after Ziegler resigned, she told the Texas Unemployment Commission that she quit because of her general treatment, her level of pay, and her health care benefits. (*Id*. at 189–192). The EEOC does not cite a case to support its argument that Ziegler was fired when Walker accepted her resignation immediately rather than allowing her to work for an additional two weeks. Several cases have reached the opposite conclusion. *See, e.g., Borque v. Powell Elec. Mfg. Co.*, 617 F.2d 61, 64 (5th Cir. 1980); *Leyva v. Computer Scis. Corp.*, 2005 WL 196557 (D. Del.), *aff'd*, 169 Fed. Appx. 720 (3d Cir. 2006) ("An employer's decision to accept a resignation immediately, rather than accepting an employee's request that the resignation be effective at a future date, does not constitute an adverse employment action. . . . Plaintiff was an at-will employee. She had no right to resign and then demand her own chosen termination date."); *Wynn v. Paragon Systems, Inc.*, 301 F.Supp.2d 1343 (S.D. Ga. 2004) ("[B]ecause Wynn voluntarily terminated the employment relationship, she cannot show that she suffered an adverse employment action in this instance. Wynn submitted her resignation on June 1, 2001, to be effective June 15, 2001. The customary two weeks notice period is a traditional courtesy the employee extends to the employer. Here, Paragon informed Wynn that it did not need Wynn to serve out this two week period. Instead, it directed her to turn over the employer's property on the day she resigned.").

The EEOC argues that even if the decision to accelerate Ziegler's departure date did not amount to a firing, it was nonetheless retaliatory. The EEOC has not identified evidence

in the record that gives rise to a fact issue as to whether, when Walker accepted Ziegler's resignation immediately, it was in retaliation for complaints she had made about discrimination or harassment.  The evidence shows that Ziegler had not made any complaints to Walker.  Ziegler testified that on the day she resigned, she did not have a chance to explain her reasons for resigning when Walker stated that the resignation would take effect immediately.  The evidence does show that Walker knew that in the past, Ziegler had requested higher compensation, in part because she was not paid as much as Hoover.  After this complaint, however, Walker increased Ziegler's pay and she continued to work for three more months.  There is no evidence that Walker knew of any other complaints Ziegler had made about either discrimination or harassment.  Ziegler testified that she complained to Grahmann about his comments to her and generally about Walker's comments, but Ziegler admitted that she did not complain to Grahmann or anyone else about improper touching. (Docket Entry No. 29, Ex. 36 at 308).  Grahmann denied that Ziegler complained about harassment at all.  There is no evidence in the record to support an inference that Walker knew of Ziegler's complaints to Grahmann.  Walker testified that he had no knowledge of Ziegler's complaints while she worked there.  (Docket Entry No. 29, Ex. 37 at 70, 71). Ziegler testified that in the last two months of her work at SDS, there had been no improper touching and no improper remarks.  The record does not support a causal connection between Ziegler's alleged complaints to Grahmann about discrimination or harassment and Walker's decision to accept her resignation immediately.  *See Clark County School Dist. v. Breeden*, 532 U.S. 268, 273 (2001).

Summary judgment is granted as to the retaliation claim.[38]

## V.      Conclusion

The EEOC's motion to strike is denied.  J. H. Walker's summary judgment motion is granted as to the retaliation and unequal pay claims and denied as to the sexual harassment claim.

SIGNED on January 18, 2007, at Houston, Texas.

_____

Lee H. Rosenthal
United States District Judge

---

[38] In her original EEOC complaint, Ziegler also alleged that Walker had filed the suit against her and Mustang Delivery in retaliation for her complaints and that he was making degrading comments about her to her clients.  (Docket Entry No. 29, Ex. A at 1).  The EEOC did not include these allegations in its complaint and did not make the argument in the summary judgment briefing that either the lawsuit or the subsequent negative statements were in retaliation for Ziegler's protected activity.  The legal action was filed after Ziegler left SDS but before she filed her EEOC complaint.  The evidence shows that the statements Walker allegedly made about whether Ziegler was having a sexual relationship with a client and about her character were similarly made after Ziegler left SDS but before she filed her EEOC complaint.  The same causation problem is present.